**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSSETS**

| | |
|---|---|
| NEIGHBORLY CAPITAL COMPANY D/B/A HUMANITY CASH and NING-FENG WANG, <br><br>                 Plaintiffs, <br><br>     v. <br><br> SCHUMACHER CENTER FOR A NEW ECONOMICS, SUSAN WITT, and BERKSHARES, INC., <br><br>               Defendants. | Civil Action No. 3:23-cv-30017 |

## COMPLAINT & JURY TRIAL DEMAND

Plaintiffs Neighborly Capital Company d/b/a Humanity Cash ("Humanity Cash") and Ning-Feng Wang, as and for their Complaint against the Schumacher Center for a New Economics (the "Schumacher Center"), its Executive Director and Board Member Susan Witt, and BerkShares, Inc., allege as follows:

## SUMMARY OF THE ACTION

1.	This case is about unfair and deceptive trade practices, within the meaning of Mass. Gen. Laws ch. 93A, §§ 2 and 11, and defamation.

2.	Plaintiff Humanity Cash is a public benefit corporation that develops projects centered around digital community currencies and digital dollars. Plaintiff Ning-Feng Wang, also known as Fennie Wang, founded Humanity Cash in 2021, and Humanity Cash has been in continuous operation since then.

3.	From late 2020 through November 2022, Ms. Wang and Humanity Cash have been working with the Schumacher Center and BerkShares, Inc. on digitizing the BerkShares local currency (the "Digital BerkShares Project" or "the Project"). To that end, Ms. Wang and Humanity

Cash performed extensive research on the legal ramifications of issuing local digital currencies, engaged a technology partner to help design, develop, and launch the mobile application, helped the Schumacher Center raise in excess of $460,000 of grant funding for the Project, oversaw the operation of the mobile application, and liaised with local banks and regulatory authorities relating to legal compliance issues.

4.      Although the Schumacher Center was supposed to allocate the grant funding obtained for the Project towards its marketing, to increase awareness of the Project in the Berkshires region, the Schumacher Center improperly withheld those funds from the Project under the pretext that Humanity Cash had to develop additional, non-essential features before the Schumacher Center would market the Project.

5.      Through the summer of 2022, Ms. Witt and the Schumacher Center repeatedly requested that Humanity Cash assist it with regulatory compliance inquiries and develop additional features for the mobile application.

6.      When Humanity Cash informed the Schumacher Center that those additional features and services, as well as its maintenance of the mobile application's operation, required capital expenditures, Ms. Witt and the Schumacher Center indicated both orally and in writing that Humanity Cash's efforts would be compensated and that the Schumacher Center was in the process of determining the best path forward, namely, whether to enter a services agreement with Humanity Cash or buy the Digital BerkShares mobile application and independently maintain it.

7.      Eventually, it came to light that the Schumacher Center and BerkShares, Inc. never intended to continue their collaboration with Humanity Cash. Instead, all along, the Schumacher Center wanted to copy and rebuild the mobile application developed by Humanity Cash, ousting Humanity Cash without compensation, and made false promises of future compensation solely to buy time and obtain additional concessions from Humanity Cash.

8.      When Ms. Wang and Humanity Cash uncovered the Schumacher Center's and BerkShares, Inc.'s true intentions, as well as a series of improprieties relating to funds held in customer holding accounts for the Project, and brought their concerns to Defendants' attention, Defendants retaliated against Ms. Wang and Humanity Cash by taking a series of actions to oust them from the Project, without compensating them for their work, unilaterally shutting down the BerkShares mobile application, and making false and defamatory statements about Ms. Wang and Humanity Cash that resulted in loss of donor funding to Humanity Cash and tarnished reputation, among other things.

9.      Like in many business sectors, reputation is critical in the public benefit and not-for-profit sector, which is an especially tight-knit community of funders, donors, and grant applicants and recipients, making the favor and goodwill of all participants an invaluable part of Humanity Cash's operations. Humanity Cash has enjoyed a good reputation within the market.

10.     Since at least May 2022, however, Humanity Cash's reputation has been under attack by Defendant Susan Witt, who has called Ms. Wang a "carpetbagger" and accused her and Humanity Cash of being hostile towards the Schumacher Center.

11.     In October 2022, Ms. Witt interfered with the imminent grant funding to Humanity Cash by NoVo Foundation.

12.     At that time, Ms. Witt urged Martin Kirk at NoVo Foundation to discontinue all dealings with Humanity Cash because it was a threat to the local not-for-profit sector and an "outside party with outsized leverage over local community." Ms. Witt also falsely accused Ms. Wang and Humanity Cash of coercive and threatening conduct towards the Schumacher Center.

13.     Ms. Witt's statements were false. Humanity Cash never engaged in any threatening or coercive conduct towards the Schumacher Center. To the contrary, Ms. Witt and the

Schumacher Center, by being in control of funding and governance of the Digital BerkShares Project, had and exercised outsize leverage over Humanity Cash to force undue concessions.

14.     Ms. Witt's and the Schumacher Center's false statements about Ms. Wang, Humanity Cash, and their business practices have harmed Ms. Wang and Humanity Cash.

15.     After NoVo Foundation withdrew its grant funding to Humanity Cash, Humanity Cash wrote to Ms. Witt and the Schumacher Center and demanded that Ms. Witt withdraw her defamatory statements and stop defaming Humanity Cash, to no avail.

16.     Instead, the Schumacher Center and BerkShares, Inc. unilaterally shut down the Digital BerkShares mobile application, developed and launched by Humanity Cash, without providing any compensation to Humanity Cash for its services. Shortly thereafter, BerkShares, Inc. announced its plans to copy and rebuild the mobile application.

17.     Defendants' conduct in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 11 – namely, misleading Humanity Cash and Ms. Wang about Defendants' intentions to compensate them for their services, retaining for the benefit of the Schumacher Center substantially all the donor and grant funding that was earmarked for the Digital BerkShares Project, ousting Humanity Cash from the Project and spreading false statements about Ms. Wang and Humanity Cash, improperly maintaining customer holding account funding, unilaterally shutting down the mobile application developed by Humanity Cash, and announcing its own plans to copy and rebuild it – has caused significant harm to Ms. Wang and Humanity Cash.

## PARTIES

18.     Plaintiff Humanity Cash is a public benefit corporation organized under the laws of the state of Delaware with a registered office in Brooklyn, New York.

19.     Plaintiff Ning-Feng Wang, also known as Fennie Wang, is the founder and Chief Executive Officer of Humanity Cash and resides in Queens, New York.

20.     Defendant Schumacher Center is a 501(3)(c) tax-exempt not-for-profit corporation organized under the laws of the state of Massachusetts and headquartered in Great Barrington, Massachusetts.

21.     Defendant Susan Witt is an individual domiciled in Great Barrington, Massachusetts, is over 18 years old, and is otherwise *sui juris*. Ms. Witt is the Executive Director of the Schumacher Center, as well as Treasurer of the Board of Directors of both the Schumacher Center and BerkShares, Inc.

22.     Defendant BerkShares, Inc. is a not-for-profit corporation, organized under the laws of the state of Massachusetts and headquartered in Great Barrington, Massachusetts. It is not, however, registered as a 501(3)(c) tax-exempt organization under the Internal Revenue Service.

## JURISDICTION AND VENUE

23.     The court has original jurisdiction of this action pursuant to 28 U.S.C. §1332 because Plaintiffs and Defendants are domiciled in different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

24.     Venue in this district is proper pursuant to 28 U.S.C. §1391 because a substantial part of the acts and events giving rise to the claims in this Complaint occurred in this judicial district.

## BACKGROUND FACTS

### BerkShares Community Currency

25.     A community currency is a local currency, typically pegged to the national currency, designed to encourage and facilitate greater wealth recirculation in a regional economy.

26.     As part of its efforts to foster the local economy in Berkshire County, Massachusetts, the Schumacher Center created a community currency. The BerkShares local

currency, marketed as fully backed by US dollars and held in community banks for use at participating businesses, debuted in 2006 in the form of paper bills.

27.     Since 2006, BerkShares have circulated as paper notes in the Berkshires region with 400 participating businesses, and more than $10 million worth of BerkShares have been issued since their inception.

28.     The BerkShares paper notes can be obtained from tellers at participating banks, in exchange for an equivalent amount of US dollars. Those US Dollars are deposited into a customer holding account, which is a checking account held by BerkShares, Inc. on behalf of the BerkShares program at Salisbury Bank, Lee Bank, and Pittsfield Cooperative Bank. The BerkShares notes can then be spent at participating merchants as a form of payment, and merchants can redeem the notes for US dollars.

29.     BerkShares, Inc. is the issuer and administrator of BerkShares local currency.

30.     On paper, BerkShares, Inc. is independent and separate from the Schumacher Center, but it is *de facto* controlled by the Schumacher Center. The Program Administrator for BerkShares, Inc. is David Fix, who also shares the title of Director of Operations at the Schumacher Center. The Marketing Director for BerkShares, Inc. is Jared Spears, who also shares the title of Director of Communications and Resources at the Schumacher Center. The Treasurer of the BerkShares, Inc. Board of Directors is Susan Witt, who is also the Schumacher Center's Executive Director and Treasurer of its Board of Directors.

### The Digital BerkShares Project

31.     Ms. Wang has experience working on Wall Street as a research analyst at JPMorgan, and subsequently as a capital markets and financial investigations attorney at global law firms WilmerHale and Latham & Watkins. She has worked on various aspects of the nascent digital currency industry since 2017, including early projects in digital currencies called

"stablecoins" that are designed to be pegged to the value of a national currency, such as US dollars. Her experience includes a blockchain-based community currency project in Kenya called Sarafu, supported by the Danish Red Cross where she worked on innovation grants to further the work of community currencies and, together with local Kenyan counsel, developed the legal structure of Sarafu.

32.    In 2020, Ms. Wang was exploring ways to put her knowledge of blockchain technology and her legal experience towards a use case that would help enhance financial inclusion and economic development in the United States.

33.    When Ms. Wang learned about the Berkshires-based community currency, she reached out to the Schumacher Center about the possibility of providing a digital component to BerkShares physical notes, especially with the advent of COVID-19 accelerating the decline in the use of cash while increasing the use of credit cards and other forms of electronic payments.

34.    The process of creating a digital version of the BerkShares community currency began in the fall of 2020, when Ms. Wang met with the Schumacher Center's Susan Witt and Rachel Moriarty in Great Barrington, Massachusetts, to discuss jointly developing digital BerkShares. At that time, Ms. Moriarty was the Schumacher Center's Director of Operations and the BerkShares Program Administrator.

35.    During the winter and spring of 2021 Ms. Wang and Defendants began to develop the Digital BerkShares Project. Ms. Wang's efforts included addressing design of the digital currency technology platform, structure of the regulatory framework, and identification of potential sources of funding for the Project.

36.    Ms. Wang founded Humanity Cash in May 2021 to create a technology platform that enables communities to issue community-focused digital currencies, backed by US dollars.

Initially the platform was to be implemented through the Digital BerkShares Project and to build on its success by expanding to other communities.

37.     On June 2, 2021, Humanity Cash, the Schumacher Center, along with BerkShares, Inc., entered into the Collaboration Agreement to formalize and implement the Digital BerkShares Project.

38.     Under the Collaboration Agreement, Humanity Cash was tasked with the responsibility of developing the technology and a mobile application for digital BerkShares and the regulatory compliance strategy. The Schumacher Center and BerkShares, Inc. were responsible for marketing the program to drive user adoption and increase public awareness.

39.     On March 21, 2022, the Digital BerkShares Project was successfully launched when it became available in the Berkshires region and the Digital BerkShares mobile application launched in the Apple App store and Google Play store.

40.     Digital BerkShares preserved the same fundamental structure as the physical note program, working with Salisbury Bank and Lee Bank to hold the underlying customer funds in separate checking accounts in the name of BerkShares, Inc. for the benefit of digital BerkShares users.

41.     Digital BerkShares was the first of its kind, community-based digital dollar that transacted and settled on a public blockchain ledger, which is a type of ledger that records transactions of digital tokens using cryptography to prove the validity of each transaction.

42.     The role of the blockchain ledger is to supplant the credit card interchange networks, primarily Visa and Mastercard, thereby providing savings for merchants on card interchange fees, which can run as high as 3-4% per transaction.

43.     The regulatory structure for Digital BerkShares was carefully designed by Ms. Wang and Humanity Cash, in coordination with the Schumacher Center's outside legal counsel

and a Harvard Law School Clinical program, to meet a prepaid closed-loop model for stored value payment instruments, whereby each BerkShares token was issued upon pre-funding in US dollars on a dollar-for-dollar basis. The tokens were subsequently spent within a closed network of local businesses in Berkshires County, Massachusetts, rather than being widely available like a Visa or Mastercard issued payment card. By design, this was to encourage patronage of small businesses in the community rather than capital flight to large businesses outside of the region.

44.     Humanity Cash's design of the regulatory structure began even before it started working on developing the technology underlying digital BerkShares when, in the spring of 2021, Ms. Wang – at Ms. Witt's suggestion – supervised two Harvard Law School students in a legal clinic to conduct user research to identify the key technology features as well as understand the regulatory frameworks that would apply to digital BerkShares.

45.     In April 2021, Ms. Wang also introduced the law firm Dechert LLP to the Schumacher Center as *pro bono* counsel to advise on the regulatory frameworks that would apply to digital BerkShares.

46.     On August 19, 2021, Ms. Wang, together with the Schumacher Center's outside legal counsel from Dechert, presented to Lee Bank and Salisbury Bank a regulatory overview of the proposed Digital BerkShares Project, based on their analysis and applicability of the US Department of the Treasury Financial Crimes Enforcement Network ("FinCEN") Prepaid Rule of 2011 to digital BerkShares, whereby prepaid closed loop programs would be exempt from the Federal Bank Secrecy Act and attendant regulatory requirements, such as the need for the prepaid provider to register as a money services business with FinCEN. Ms. Witt was present at this meeting.

47.     In the Spring of 2021, Humanity Cash and the Schumacher Center began considering potential funding sources for the Digital BerkShares Project.

48.     Ms. Wang wrote several grant funding applications and explored funding opportunities within her own network seeking money to support the Project.

49.     Through Ms. Wang's efforts, on or about April 1, 2021, Ryan Salame, an executive at a cryptocurrency-focused hedge fund, agreed to contribute $100,000 to the development of the Digital BerkShares Project.

50.     At the time, Ms. Wang had not yet set up a legal entity for Humanity Cash, and Mr. Salame instead made his contribution to the Schumacher Center for the purpose of funding the Digital BerkShares Project, at Ms. Wang's suggestion.

51.     The Schumacher Center, through Ms. Witt, committed to Ms. Wang that $50,000 of Mr. Salame's donation would be used to back the issuance of 50,000 BerkShares tokens as giveaway incentives to the public, and the other $50,000 would be used for general marketing.

52.     Ms. Witt sought to promote Mr. Salame's donation as an incentive for other donors in the Berkshires to match his donation. By fall of 2021, Ms. Witt did find at least one other donor who provided $10,000 towards the BerkShares giveaway, which brought the total donations allocated for backing giveaway BerkShares tokens to $60,000, or 60,000 BerkShares tokens.

53.     Throughout the spring and summer of 2021, based on feedback from users, banks, and payments experts, Humanity Cash designed what later became digital BerkShares, including product and user experience design, high-level architectural design of the back-end processes, as well as the regulatory framework.

54.     During this time period, the Schumacher Center staff, including Ms. Witt and Ms. Moriarty, participated in sessions going over the design requirements of the BerkShares mobile application.

55.     From the summer of 2021 until the launch of the application to the public on March 21, 2022, Humanity Cash worked on the coding, engineering, testing, and deployment of the application.

56.     Humanity Cash staff and the Schumacher Center staff, including Ms. Moriarty, Mr. Spears, and Ms. Witt, as well as the Schumacher Center and BerkShares, Inc. volunteers, were involved in various aspects of testing, such as downloading the test versions, checking if the bonus BerkShares were received, whether a bank account could be linked, whether BerkShares tokens were received upon deposit, and whether transactions between users were successful.

57.     Ms. Wang spent the summer of 2021 in Berlin, Germany and Amsterdam, Netherlands to work closely with Humanity Cash's technical and design teams.

58.     From September 2021 and through January 2022, Ms. Wang lived on-site with the Schumacher Center in the Berkshires to prepare for the launch of the Digital BerkShares Project and to get to know the community members.

59.     During the fall 2021 semester, Ms. Wang once again supervised two Harvard Law School students for the clinic program to continue conducting research for the Digital BerkShares Project.

60.     Ms. Wang also introduced the financial services law firm McConigle, P.C. to the Schumacher Center as *pro bono* counsel and invited McConigle to participate in the Harvard Law School clinic program, where the students, Ms. Wang, and counsel from McConigle worked on bank agreements between BerkShares, Inc. and Salisbury Bank and Lee Bank, the user terms and conditions, the privacy policy, and research relating to money services businesses. Schumacher Center staff members, Ms. Moriarty and, at times, Mr. Spears, participated in all weekly meetings with the Harvard Law School students and counsel from McConigle. Ms. Witt was apprised at all times of the discussions.

61.     From October 2021 through the summer of 2022, Ms. Wang and Humanity Cash's engineering team met twice a week with Ms. Moriarty, Mr. Spears and, at times, Ms. Witt from the Schumacher Center to discuss deployment progress, including examining trends in digital BerkShares statistics, including number of tokens outstanding, deposits, withdrawals, transfers, as well as business and marketing development plans.

62.     In the fall of 2021, Mr. Spears and Ms. Moriarty presented the Schumacher Center's marketing plan to support the launch of the digital Berkshires that included radio advertising and pricing information for billboard advertising.

63.     The marketing plan, however, was never implemented upon the Digital BerkShares Project's launch in March 2022, or at any other time, despite Ms. Wang's repeated inquiries with the Schumacher Center staff about plans for a marketing campaign to increase awareness of the Project in the Berkshires region.

64.     All along, Ms. Wang continued to identify and pursue funding opportunities for the Digital BerkShares Project.

65.     To that end, in November 2021, Ms. Wang met with Martin Kirk, the Senior Special Projects Coordinator at NoVo Foundation, about funding support for the Digital BerkShares Project.

66.     NoVo Foundation subsequently approved $360,000 in grant funding to the Schumacher Center, earmarked for the Digital BerkShares Project in 2022-23.

67.     To facilitate NoVo Foundation's grant to the Schumacher Center, at Ms. Moriarty's request, Ms. Wang provided the Schumacher Center with estimates for costs associated with operating the Digital BerkShares Project.

68.     In total, Ms. Wang directly helped the Schumacher Center secure at least $460,000 in grant funding specifically earmarked for the Digital BerkShares Project. This funding was to be

used by the Schumacher Center for marketing, user adoption, and program support, enabling the Schumacher Center to fulfill its obligations under the Collaboration Agreement.

69.     The $460,000 in grant funding raised for the Schumacher Center to support the Digital BerkShares Project was significant, and not merely incidental, to the Schumacher Center's annual revenues, which averaged around $550,000 annually, inclusive of pass-through funding for its fiscally sponsored independent researchers.

### Issuance of Digital BerkShares

70.     Instead of a physical exchange of US dollars for BerkShares notes, users would download the BerkShares mobile application, link their bank account as a funding source to load their BerkShares wallets, and receive BerkShares tokens in their digital wallets upon settlement of a bank transfer that moved funds from the user's bank account to the customer holding account at Salisbury Bank or Lee Bank.

71.     Subsequent transactions of BerkShares with local merchants were settled over the Celo blockchain network.

72.     A digital BerkShares token could only be issued – or "minted" – on the blockchain ledger (meaning a BerkShares token is created and recorded on the blockchain ledger) upon receipt of equivalent US dollar funds in the holding account, *i.e.*, it is a prepaid transaction.

73.     BerkShares tokens could only be retired – or "burned" – on the blockchain ledger (meaning a BerkShares token is destroyed and recorded as such on the blockchain ledger) upon a merchant requesting a cash-out, whereby a bank transfer is sent from the holding account to the merchant's linked bank account.

74.     BerkShares tokens could only be spent in a closed network in a limited geographic area and are not tradeable on any exchanges.

75.     BerkShares token issuances and redemptions could be reconciled against the bank transfers to and from the holding accounts and confirmed against the bank statements of the customer holding accounts at Salisbury Bank and Lee Bank, which were the canonical records of the underlying dollar reserves backing the issuance of BerkShares tokens.

76.     This "prepaid closed loop model," subject to restrictions on daily user wallet value, enabled the Schumacher Center and BerkShares, Inc. to be exempt from the Bank Secrecy Act and attendant regulatory requirements, such as registration with FinCEN as a money services business.

77.      The BerkShares digital wallet could not hold any US dollars, only BerkShares tokens. Once in the user's wallet, there was no set expiration date for BerkShares tokens.

### Public Launch of the Digital BerkShares Project

78.     On January 19, 2022, the Schumacher Center announced the upcoming launch of the Digital BerkShares Project on the BerkShares, Inc.'s website:

> BerkShares will soon be launching a mobile payment app! Digital BerkShares will be 1:1 with US Dollars, and can be used and exchanged with any iphone or android device.
>
> As part of the launch, 60,000 BerkShares will be given away to the community – B$10 for each user that signs-up and activates their wallet.

79.     On February 8, 2022, following instructions to the Schumacher Center staff to deposit $60,000 into the BerkShares holding accounts at Salisbury Bank and Lee Bank to ensure that 60,000 BerkShares would be properly prepaid, Humanity Cash minted 60,000 BerkShares tokens on the Celo blockchain.

80.     On March 21, 2022, digital BerkShares became available in the Berkshires region and the BerkShares mobile application launched in the Apple App store and Google Play store.

81.     At its height, there were approximately 620 digital BerkShares accounts, which included approximately 90 local businesses that accepted digital BerkShares, and approximately 90,000 minted digital BerkShares.

**Extra-Contractual Demands by the Schumacher Center and BerkShares, Inc.**

82.     Following the launch, Ms. Witt unexpectedly requested additional review of the Digital BerkShares Project's potential exposure to regulatory requirements associated with money services businesses.

83.     Even though the parties had addressed those regulatory requirements before launching the digital BerkShares, Ms. Witt asserted that she needed additional assurances that BerkShares, Inc. did not have to register as a money services business and take on liabilities and responsibilities for complying with related financial laws and regulations.

84.     At Ms. Witt's request, Ms. Wang worked with a new law firm serving as outside counsel to the Schumacher Center, Nutter McClennen & Fish LLP, to confirm that the Digital BerkShares Project's was not a money services business because it operated as a prepaid closed-loop model for stored value payment instruments.

85.     That did not allay Ms. Witt's concerns, however, and Ms. Witt and another member of the Schumacher Center's Board of Directors, Paul Fletcher-Hill, requested that Humanity Cash provide additional services for BerkShares, Inc. and the Schumacher Center and assume responsibility for the Project's money services registration requirements, if such a registration became necessary in the future.

86.     In response to that request, Ms. Wang explained to Ms. Witt and Mr. Fletcher-Hill that if Humanity Cash were to take on that additional responsibility, Humanity Cash would be required to be the counterparty to the bank agreements with Salisbury Bank and Lee Bank relating

to the customer holding accounts (instead of BerkShares, Inc.) and that the parties would, therefore, have to enter into a new agreement to reflect their new legal relationship.

87.     On May 18, 2022, Ms. Wang and her colleague, Andy Kalambi, visited Ms. Witt at the Schumacher Center's headquarters in Great Barrington, Massachusetts.

88.     During that meeting, the parties discussed the ongoing technical, operational, and infrastructure services for the Digital BerkShares Project, and Ms. Wang inquired about marketing campaigns and support for the Digital BerkShares Project that the Schumacher Center was supposed to provide pursuant to the Collaboration Agreement.

89.     Ms. Wang further inquired about the grant funding that Ms. Wang had helped the Schumacher Center secure for Digital BerkShares marketing and user adoption campaigns. Specifically, Ms. Wang expressed concerns that although adequate funds had been raised, the Schumacher Center and BerkShares, Inc. had not provided marketing and user adoption efforts sufficient to meet their obligations under the Collaboration Agreement.

90.     Ms. Witt responded that the Schumacher Center and BerkShares, Inc. would not provide marketing support to the Digital BerkShares Project until the parties resolved the money services business concerns and Humanity Cash developed certain additional, non-essential features – even though the Collaboration Agreement did not impose such preconditions to the Schumacher Center's and BerkShares, Inc.'s performance of their obligations.

91.     During this meeting, Ms. Wang reiterated to Ms. Witt that Humanity Cash would not be able to take on additional responsibilities, such as the money services business registration requirements, without also participating in the governance of the Project to ensure its compliance with the relevant laws and regulations and mitigate potential liabilities, and that the requisite governance participation could be achieved by allotting to Humanity Cash a seat on BerkShares, Inc.'s Board of Directors.

92.     In response, Ms. Witt became visibly angry; she slammed the table, threatened to shut down the Digital BerkShares Project, and in a raised tone of voice, called Ms. Wang a carpetbagger. Ms. Witt also stated that the Schumacher Center would never allow Humanity Cash to participate in the Digital BerkShares Project's governance because Humanity Cash was a mere service provider for the Project, and not a local member of the Berkshires community.

93.     Ms. Wang suggested that, if Humanity Cash's participation in the Project were limited to that of a service provider – rather than a collaboration partner with attendant rights and responsibilities – then the parties' agreement had to be amended to reflect that relationship, and Humanity Cash had to be compensated, at a minimum, for the Project's future development and infrastructure services to be provided by Humanity Cash including, but not limited to, costs of servers, technical support, and other operational support.

94.     To fund ongoing services costs, Ms. Wang proposed adding revenue-generating application features, including in-app advertising.

95.     Ms. Witt hastily rejected Ms. Wang's proposal as against the Schumacher Center's community-focused values and countered that the Collaboration Agreement did not provide for compensation of Humanity Cash's ongoing service costs.

96.     Although the Collaboration Agreement indeed did not provide for compensation for Humanity Cash's contribution to the Project, neither did it obligate Humanity Cash to pay for ongoing services to maintain the Project or to develop additional features.

97.     More importantly, the nature of the parties' relationship had changed since the inception of the Project, including as a result of the successful launch of the digital BerkShares and Ms. Witt's insistence that Humanity Cash act as a mere service provider to the Project rather than a collaboration partner with the Schumacher Center and BerkShares, Inc.

98.     Finally, Ms. Wang reminded Ms. Witt about Ms. Wang's successful fundraising efforts, whereby Ms. Wang helped the Schumacher Center raise in excess of $460,000 in grant funding for the Digital BerkShares Project. Ms. Wang suggested that a portion of that funding could be used to compensate Humanity Cash for its significant contribution to the launch, operation, and further development of the Project while allowing the Schumacher Center to retain full control over the Project's governance.

99.     Again, Ms. Witt rejected Ms. Wang's suggestion and mocked Ms. Wang's plea to acknowledge that Ms. Wang's contributions to the Project went well beyond the requirements of the Collaboration Agreement.

100.    After their disheartening meeting with Ms. Witt, Ms. Wang and Mr. Kalambi were approached by Ms. Moriarty, who overheard their conversation with Ms. Witt. Ms. Moriarty suggested that Ms. Wang and Mr. Kalambi reach out to other members of BerkShares, Inc.'s Board of Directors, and that she understood and appreciated Humanity Cash's contribution to the Project.

101.    Several days after the meeting, on May 23, 2022, Ms. Witt reached out to Ms. Wang and Mr. Kalambi to apologize for her behavior during their meeting:

> I apologize for the tone of the conversation on Wednesday. [Ms. Wang], you have done a superb job in creating a new application on the blockchain. The app is amazing. It has been an uncertain path getting here, but we all stuck through it. The product works and is being successfully adopted. Congratulations.

102.    Ms. Witt reiterated the Schumacher Center's demand that Humanity Cash assume all responsibility for the Project's money services business obligations. Because Defendants' demands were outside of the scope of the Collaboration Agreement, Humanity Cash proposed that the parties enter into a service contract to govern Humanity Cash's new role and presented a draft of a new services contract.

103.    The draft services contract outlined the conditions of Humanity Cash registering as a money services business, which included ownership of the holding accounts and changes to the Project's governance structure. The language around the governance structure was left broad to leave room for negotiation. The draft services contract left a placeholder for its estimated cost of services in the draft services contract because that cost was likewise subject to the parties' discussion.

104.    From June 5 through July 8, 2022, two of the Schumacher Center's board members, Mr. Fletcher-Hill and Alice Maggio, engaged in continuous discussions with Ms. Wang to resolve the now-apparent conflict relating to Humanity Cash's role going forward and the Project's infrastructure costs.

105.    Throughout those discussions, BerkShares, Inc. and the Schumacher Center accepted Humanity Cash's ongoing services with the knowledge of Humanity's Cash's expectation that, eventually, the parties would formalize the services contract to compensate Humanity Cash.

106.    On July 10, 2022, Mr. Fletcher-Hill contacted Ms. Wang and Mr. Kalambi to schedule a comprehensive discussion and review of Humanity Cash's costs associated with the Project, ahead of BerkShares Inc.'s upcoming Board meeting.

107.    Hopeful that they were on the path to reaching an amicable resolution, during their call on July 12, 2022, Ms. Wang and Mr. Kalambi were taken aback when Mr. Fletcher-Hill and Ms. Witt requested that Humanity Cash develop additional new features for the application and conditioned any marketing of the Project on Humanity Cash's delivery of those features.

108.    Ms. Wang and Mr. Kalambi explained to Ms. Witt and Mr. Fletcher-Hill that before Humanity Cash could undertake such additional tasks, the parties had to agree on a path forward

that necessarily involved some level of compensation for Humanity Cash's costs of maintaining infrastructure for the Project as well as development of new features.

109.    Ms. Wang and Mr. Kalambi informed Ms. Witt and Mr. Fletcher-Hill that it would cost $84,000 annually to maintain the Project's infrastructure, not inclusive of costs of any new feature developments.

110.    Alternatively, in response to Ms. Witt's and Mr. Fletcher-Hill's inquiry, Mr. Kalambi informed them that BerkShares, Inc. could buy the Digital BerkShares mobile application from Humanity Cash for $157,000, inclusive of the BerkShares.org website and Amazon Web Services hosting costs to date, at a significant discount to the actual cost of the application's development, as a gesture of goodwill to ensure the continued success of the Digital BerkShares Project.

111.    Mr. Fletcher-Hill and Ms. Witt stated that they would discuss Humanity Cash's proposal with BerkShares, Inc.'s Board of Directors, and that if the costs were not acceptable, then the Project would need to be terminated.

112.    On July 14, 2022, Mr. Kalambi followed up with Ms. Witt about their discussion from July 12, 2022. Ms. Witt did not indicate to Mr. Kalambi that Humanity Cash's proposal was not acceptable to BerkShares Inc.'s Board of Directors, which led Mr. Kalambi and Ms. Wang to believe that both sides were on the same page regarding compensating Humanity Cash for its services.

113.    Further supporting that impression, and knowing that Humanity Cash expected to be compensated for its services, Ms. Witt continued asking Ms. Wang to provide additional assistance with managing the Digital BerkShares Project, namely, responding to the Federal Deposit Insurance Corporation ("FDIC") inquiries to Salisbury Bank and Lee Bank, which

maintained the Project's holding accounts, and addressing technical support service issues through August and September 2022.

### Humanity Cash Discovers a Series of Improprieties with the Schumacher Center's Management of the Digital BerkShares Project's Grant Funding

114.    On July 21, 2022, Ms. Wang and Mr. Kalambi met for coffee with one of BerkShares, Inc.'s board members, Andrew Weibel.

115.    When Ms. Wang and Mr. Kalambi asked Mr. Weibel about the outcome of BerkShares Inc.'s board meeting earlier that month, Mr. Weibel said that it came to light that the Schumacher Center had not properly allocated operating costs for the Project. As a result, Ms. Witt tasked Mr. Weibel and another board member, Dennis Iodice, the President of BerkShares, Inc.'s Board of Directors, with identifying revenue models to support ongoing operating costs.

116.    In response to Ms. Wang's and Mr. Kalambi's questions about the Schumacher Center's status as the fiscal sponsor to BerkShares, Inc. and hundreds of thousands of dollars of grant funding that was provided to the Schumacher Center specifically for the Digital BerkShares Project, Mr. Weibel responded that he would inquire whether the grant funding could be made available to support the Project's operating costs.

117.    In August 2022, Mr. Weibel informed Ms. Wang that he, as BerkShares Inc.'s board member, did not have access to information about the grant funding provided to the Schumacher Center and could not, therefore, exercise oversight over the grant funding allocated to the Digital BerkShares Project.

118.    Around the same time, in early August 2022, Salisbury Bank asked BerkShares, Inc. and Humanity Cash for assistance in answering questions from the FDIC regarding the Digital BerkShares Project, as part of Salisbury Bank's annual regulatory exam.

119.    In response to the FDIC questions about the relationship between the Schumacher Center and BerkShares, Inc., Ms. Witt did not describe the full nature of the Schumacher Center's involvement in running the Digital BerkShares Project.

120.    Instead, Ms. Witt described BerkShares, Inc. as "administering" the Digital BerkShares Project and stated that the Schumacher Center provided merely "research and development," when in reality, the Schumacher Center's Board of Directors and Ms. Witt controlled BerkShares, Inc.

121.    The Schumacher Center staff and contractors operate all aspects of both the paper and Digital BerkShares Project, including access to customer funds held in the name of BerkShares, Inc.

122.    The Schumacher Center accepts grants for all BerkShares-related programming, including the Digital BerkShares Project, but it does not hold itself out as the fiscal sponsor of BerkShares, Inc., whereby liability of the sponsee would ascend to the sponsor. Rather, the Schumacher Center identifies itself as a "donor" or "funder" to BerkShares, Inc., thereby justifying control over the program without taking on requisite liability.

123.    Ms. Witt serves as both Treasurer of the Schumacher Center and Treasurer of BerkShares, Inc., creating conflicts of interest and no meaningful oversight of how customer funds and donor funds are handled vis-a-vis the Schumacher Center and BerkShares, Inc.

124.    While BerkShares, Inc. carries liabilities for the Project, serving as the counterparty to the Digital BerkShares Project's user terms and conditions, as well as the bank agreements for customer holding accounts at Salisbury Bank and Lee Bank, it has essentially little to no net assets on its balance sheet (outside of customer funds) because all assets and grants are provided to the Schumacher Center.

125.    Around the same time, in retaliation to Ms. Wang's request to negotiate a new agreement among the Schumacher Center, BerkShares, Inc., and Humanity Cash to properly compensate Humanity Cash for its contributions to the Project and for greater transparency around grant funding provided to the Schumacher Center for the Digital BerkShares Project, Ms. Witt began to take steps to oust Humanity Cash from the Project.

126.    On or around August 23, 2022, Ms. Witt met with a prospective BerkShares, Inc. Board Member. During that meeting, Ms. Witt stated that the Schumacher Center planned to spend up to $250,000 to copy Humanity Cash's Digital BerkShares mobile application.

127.    To that end, the Schumacher Center prepared a job description to hire a blockchain engineer to copy and rebuild Humanity Cash's Digital BerkShares mobile application, and Ms. Witt shared the job description with the prospective Board Member.

128.    When the prospective Board Member asked why BerkShares Inc. would not simply buy the mobile application from Humanity Cash or enter the proposed service agreement with Humanity Cash, Ms. Witt responded that she did not want to give money to an outsider, specifically a "Columbia-trained lawyer," referring to Ms. Wang.

129.    In September 2022, Celo Foundation, interested in providing funding for the Digital BerkShares Project, conducted a visit to Great Barrington to undertake due diligence on the Schumacher Center, BerkShares Inc., and the Digital BerkShares Project.

130.    As part of its diligence, Celo Foundation interviewed Lee Bank and various local merchants and users to get feedback on the Digital BerkShares Project.

131.    On September 7, 2022, Ms. Wang accompanied Celo Foundation on a visit to the Schumacher Center. There, the Celo team asked the Schumacher Center staff about marketing plans for the Project because feedback from their interviews with local merchants and users had identified insufficient marketing.

132.    Ms. Witt informed the Celo team that she was withholding at least $180,000 in grant-sponsored marketing funding, for each of 2022 and 2023, until Humanity Cash provided additional non-essential features that she had requested.

133.    Celo Foundation also inquired about the governance structure of the Digital BerkShares Project and the relationship between the Schumacher Center and BerkShares, Inc., including whether there were plans to make BerkShares Inc. an independent entity from the Schumacher Center in the future.

134.    Ms. Witt insisted that BerkShares Inc. was already separate from the Schumacher Center.

135.    Celo Foundation staff members concluded that the Schumacher Center's responses regarding governance and funding lacked transparency and believed that the Schumacher Center was holding marketing of the program "hostage" to unreasonable demands.

136.    Following the visit, the Celo Foundation determined that it would not provide funding support for the Digital BerkShares Project because it did not believe that the Schumacher Center met its obligations of providing marketing and publicity for the Project and expressed concerns around governance.

137.    On October 7, 2022, in response to Humanity Cash's request that the Schumacher Center start paying for services based on the per annum cost presented in July, Ms. Witt wrote:

> We continue to look for funding to buy-out Humanity Cash, based on the proposal you had shared in July. Our goal is to compensate you and the team for work you've done and maintain operations of the program.

138.    Ms. Witt's response led Ms. Wang to believe that the Schumacher Center did not oppose the proposed services agreement or the buy-out offer, whereby the Schumacher Center

would adequately compensate Humanity Cash for its contribution to the Digital BerkShares Project.

139.   Around the same time, Salisbury Bank requested proof that digital BerkShares tokens were 1:1 fully backed by US dollars as of September 30, 2022, ahead of its upcoming meeting with the FDIC.

140.   On October 10, 2022, Ms. Wang requested bank statements from the Schumacher Center to demonstrate that all minted BerkShares tokens were backed on a 1:1 basis with US dollars in the customer holding accounts.

141.   Mr. Spears provided bank statements for both Salisbury Bank and Lee Bank to Ms. Wang, at which point Ms. Wang learned that $40,000 of the $60,000 of donor funds were never deposited into the customer holding accounts.

142.   When Ms. Wang alerted members of both the Schumacher Center's and BerkShares, Inc.'s boards to this crucial funding discrepancy, Ms. Witt confirmed that despite the issuance of 60,000 digital BerkShares tokens in February 2022 for the Project's giveaway program, the Schumacher Center deposited only a fraction of the US dollars backing the tokens – $20,000 – into the customer holding accounts.

143.   The Schumacher Center and BerkShares, Inc. knew that 60,000 digital BerkShares tokens had been issued (or minted) because the Schumacher Center advertised the 60,000 giveaway BerkShares on the BerkShares.org website, and the Schumacher Center staff participated in weekly meetings with Ms. Wang and her technical team, going over blockchain transactions, examining trends in wallet holdings, outstanding BerkShares tokens, and transaction volume.

144.   Further, the Schumacher Center staff and Ms. Witt spent considerable time over more than a year on legal work going over the prepaid closed loop nature of BerkShares as the regulatory linchpin for both paper and digital BerkShares.

**The Schumacher Center Retaliates Against Ms. Wang and Humanity Cash**

145.    On October 17, 2022, Ms. Witt invited Ms. Wang and Mr. Kalambi to a meeting with members of the Schumacher Center's and BerkShares, Inc.'s boards.

146.    Matt Stinchcombe, Mr. Fletcher-Hill, Ms. Maggio, and Ms. Witt represented the Schumacher Center's board, and Mr. Iodice and Kyle Patzwahl represented the BerkShares, Inc.'s board.

147.    Mr. Stinchcombe informed Ms. Wang that the Schumacher Center did not have sufficient funds to accept Humanity Cash's buy-out offer. The Schumacher Center could offer at most $25,000 to either buy the Digital BerkShares Project mobile application from Humanity Cash or shut down the Project, even though only 10 days earlier, Ms. Witt had indicated that she was working on a reasonable response to Humanity Cash's $157,000 proposal.

148.    During the meeting, Mr. Fletcher-Hill and Ms. Witt both threatened to unilaterally shut down the Digital BerkShares Project's mobile application if Ms. Wang did not accept their offer.

149.    Because the Schumacher Center (through BerkShares, Inc.) was the legal issuer of digital BerkShares – it controlled the underlying bank accounts that held customer funds – the Schumacher Center also held administrative control over the bank account transfer service, Dwolla, that Humanity Cash deployed to fund deposits and withdrawals from user accounts, against which corresponding BerkShares tokens would be minted and burned to each user's digital wallet.

150.    This meant that, if the Schumacher Center wished to shut down the BerkShares Project, it could unilaterally instruct Dwolla to refund all user BerkShares balances in USD.

151.    Without proper coordination of data and servers running the mobile application, however, the Schumacher Center would not have a definitive account of each user's BerkShares

token balance. It would need to reconstruct and deduce that amount based on deposit and withdrawal history that it had access to through Dwolla, combined with publicly available data on the Celo blockchain relating to BerkShares transactions for each digital wallet.

152.    Notably, users who received BerkShares tokens but did not have bank accounts associated with their wallets would not receive refunds because there would not be a record in Dwolla against which Schumacher Center could make a manual refund in US Dollars.

153.    Also importantly, without coordination with the mobile application, while user balances could be refunded in US Dollars, all token balances would remain outstanding.

154.    Ms. Wang warned that simply disabling the mobile application, without careful coordination, could lead to a disorderly shutdown, leaving digital BerkShares tokens outstanding without funds backing them, therefore potentially harming consumers and violating the user terms of service and the bank agreements.

155.    Ms. Wang also advised that the best practice to conduct the shutdown would be a coordinated move to refund US dollars while simultaneously retiring all digital BerkShares tokens. This would require having control of the Digital BerkShares Project mobile application and servers.

156.    Ms. Wang also advised the Schumacher Center that, because there has been a compliance breach, Humanity Cash could no longer be associated with the Digital BerkShares Project, including operating the shut-down, which could be perceived as a cover-up.

157.    However, Ms. Wang said that should the Schumacher Center wish to shut down the mobile application, the Schumacher Center should first buy it out at the appropriate price from Humanity Cash and then conduct all shut-down operations in a coordinated manner.

158.    Ms. Wang could not, however, accept the Schumacher Center's lowball offer of $25,000, and she informed the Schumacher Center that she needed time to consider her options before providing a formal response to the offer.

### Ms. Witt's False and Defamatory Statements

159.    Ms. Wang's shock at the Schumacher Center's appalling conduct towards her and Humanity Cash was compounded when she learned the next day that Ms. Witt had made untrue and damaging statements about Ms. Wang to Humanity Cash's prospective grant donor, which resulted in Humanity Cash's loss of $72,000 in grant funding unrelated to the Digital BerkShares Project.

160.    Over the course of the past several months, Ms. Wang has been discussing grant funding for a separate project in Kingston, New York, with Mr. Kirk at NoVo Foundation.

161.    On October 4, 2022, Mr. Kirk informed Ms. Wang that NoVo Foundation had offered Humanity Cash a grant for an unrelated community currency project in Kingston.

162.    Subsequently, Humanity Cash and NoVo Foundation moved forward with the final stages of formalizing the funding agreement, expecting the grant to be finalized on October 14, 2022, and the funding provided in December 2022.

163.    The board of the Good Work Institute approved a fiscal sponsorship for Humanity Cash to receive NoVo Foundation's grant on October 14, 2022, and that approval was the last step in finalizing the grant.

164.    To Ms. Wang's surprise, on October 18, 2022, Mr. Kirk notified her that NoVo Foundation had put Humanity Cash's grant funding on hold due to an "urgent issue" that had come up.

165.    On October 19, 2022, on the phone call among Mr. Kirk, Ms. Wang, and Mr. Kalambi, Mr. Kirk explained that NoVo's withholding of grant funding to Humanity Cash was a result of his conversation with Ms. Witt.

166.    Statements made by Ms. Witt during that conversation with Mr. Kirk included falsely accusing Ms. Wang and Humanity Cash of coercive and threatening conduct towards the Schumacher Center and described Humanity Cash as an "outside party with outsized leverage over a local community," echoing what Ms. Witt had told Ms. Wang on May 18, 2022, when she called Ms. Wang a "carpetbagger" and an outsider for asking to be part of the Digital BerkShares Project's governance.

167.    Following their call, Ms. Wang sent Mr. Kirk an email explaining the nature of the conflict between Humanity Cash and the Schumacher Center, which was precipitated by the Schumacher Center's compliance breach. Ms. Wang further explained that Ms. Witt had exacerbated the conflict by approaching NoVo Foundation with respect to Humanity Cash's pending grant, but that Humanity Cash was open to an amicable resolution with the Schumacher Center and would like to see the Digital BerkShares Project succeed. Ms. Wang invited Mr. Kirk to help with a resolution if possible.

168.    On October 24, 2022, Mr. Kirk formally informed Humanity Cash that he was withdrawing NoVo Foundations grant, as a result of Ms. Witt's statements about Ms. Wang and Humanity Cash.

**The Schumacher Center Shuts Down the Digital BerkShares Mobile Application Developed by Humanity Cash and Announces Plans to Launch Its Own Mobile Application**

169.    On November 1, 2022, Humanity Cash formally notified the Schumacher Center and its individual board members that their improper conduct in managing the grant funding for the Digital BerkShares Project, including the withholding of $40,000 that was required to have

been deposited in holding accounts as cash reserves for minted BerkShares, and improperly shutting down the Project's mobile application exposed them and the Schumacher Center to regulatory and consumer liability for potential violations of the Massachusetts Consumer Protection Act (Chapter 93A). Humanity Cash implored them to rectify the problems and to negotiate a mutually acceptable resolution.

170.   The Schumacher Center brushed off Humanity Cash's invitation to discuss a compromise and, by a letter dated November 4, 2022, it and BerkShares, Inc., purported to terminate the Collaboration Agreement. They also made new, extra-contractual demands that Humanity Cash turn over ownership and control of its intellectual property and Project related technology, including source code, the GitHub code repository, and the entire "BerkShares digital platform." Although there is no basis for these actions in the Collaboration Agreement, the Schumacher Center and BerkShares, Inc. threatened to initiate a legal action if the demands were not met.

171.   Humanity Cash rejected the demands to turn over its intellectual property on November 7, 2022.

172.   Having failed to gain control of Humanity Cash's technology and intellectual property, on November 17, 2022, the Schumacher Center suddenly and unilaterally initiated an uncoordinated shut-down of the Digital BerkShares Project Mobile Application, informing all Project participants that their wallets were being refunded that day.

173.   Neither Ms. Wang nor Mr. Kalambi were informed of the shutdown. Even though both Ms. Wang and Mr. Kalambi held BerkShares tokens, they did not receive notification of the shutdown and refund until the following day.

174.   Expending its own resources, Humanity Cash elected to keep the mobile application running on its servers until the end of November 2022. Humanity Cash did so to protect

the interests of the mobile application users who may have needed to check the refunded amounts against the balances in their digital wallets, as well as users who did not have bank accounts linked to their digital wallets to facilitate the refund of unspent tokens, such as those users who received promotional giveaway BerkShares tokens.

175.    On December 22, 2022, in its newsletter, BerkShares, Inc. announced that it planned to rebuild its own version of the Digital BerkShares mobile application in 2023, confirming that Defendants – contrary to their representations to Ms. Wang and Humanity Cash – never intended to maintain a relationship with Humanity Cash or compensate it for its services.

176.    Instead, all along Defendants had planned to arrogate for themselves all economic benefits of Plaintiffs' efforts in obtaining grant and donor funding for the Digital BerkShares Project as well as researching, developing, operating, and maintaining the mobile application. Defendants also planned to push Plaintiffs out of the Project once the digital BerkShares became operational, and to obtain for themselves the software and other Humanity Cash intellectual property created in connection with the project.

177.    By January 2023, on information and belief, the Schumacher Center closed customer holding accounts at Salisbury Bank and Lee Bank, meaning that the Schumacher Center took back the remaining customer funds as well as grants and donations that funded the promotional giveaway BerkShares tokens.

178.    In shutting down the Digital BerkShares Project, the Schumacher Center retained substantially all the donor and grant funding that was earmarked for the Digital BerkShares Project, including the donations to fund the giveaways of BerkShares tokens as well as marketing and promotional efforts to increase awareness of the Project in the Berkshires region.

**Plaintiffs Are Entitled to Pierce the Corporate Veil**

179.    As alleged above, BerkShares, Inc. is not an independent entity and is under complete domination and control of the Schumacher Center and its staff and Board of Directors.

180.    Upon information and belief, the Schumacher Center and its Board of Directors fully controls BerkShares, Inc. and makes decisions regarding its operations and policies for the benefit of itself. For example, the Program Administrator for BerkShares, Inc. is David Fix, who also shares the title of Director of Operations at the Schumacher Center. The Marketing Director for BerkShares, Inc. is Jared Spears, who also shares the title of Director of Communications and Resources at the Schumacher Center. The Treasurer of the BerkShares, Inc. Board of Directors is Susan Witt, who is also the Schumacher Center's Executive Director and Treasurer of the Board of Directors.

181.    Further, the Schumacher Center – not BerkShares, Inc. – accepted grant funding and donations meant specifically for the Digital BerkShares Project and fully controlled the allocation and disbursement of those funds.

182.    BerkShares, Inc. is, therefore, a mere alter ego, agency, or instrumentality of the Schumacher Center, and BerkShares, Inc. is completely dominated by the Schumacher Center for its enrichment.

183.    The Schumacher Center's domination and control of BerkShares, Inc. was used to commit the unlawful acts against Plaintiffs. Therefore, to the extent that BerkShares, Inc. is liable to Plaintiffs, Plaintiffs should be permitted to seek redress and damages against the Schumacher Center.

## COUNT I
### Unfair Trade Practices
### (By Humanity Cash Against the Schumacher Center and BerkShares, Inc.)

184.    Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

185.    At all times relevant to this Complaint, Humanity Cash, the Schumacher Center, and BerkShares, Inc. were engaged in trade or commerce within the meaning of Mass. G. L. ch. 93A, §§ 2 and 11.

186.    The Schumacher Center and BerkShares Inc. committed unfair and deceptive trade practices within the meaning of Mass. G. L. ch. 93A, §§ 2 and 11 including by (i) misrepresenting its intentions relating to the Digital BerkShares Project to Humanity Cash, claiming to collaborate with Ms. Wang and Humanity Cash while actually planning to obtain its Project-related intellectual property and to copy and rebuild the Digital BerkShares mobile application once it became operational; (ii) refusing to undertake the marketing obligations required by the Collaboration Agreement unless Humanity Cash provided services not required by the contract; (iii) misallocating the grants and donations made to the Schumacher Center for the benefit of the Digital BerkShares Project;  (iv) unilaterally shutting down the Digital BerkShares Project mobile application; and (v) sabotaging Humanity Cash's funding by intentionally making harmful and untrue statements about Humanity Cash and Ms. Wang.

187.    The Schumacher Center further committed unfair and deceptive trade practices within the meaning of Mass. Gen. Laws ch. 93A, §§ 2 and 11 by interfering with Plaintiffs' business advantage and making false and misleading statements about Plaintiffs that interfered with their business, harmed their reputation, and caused irreparable injury, with the intent to force undue concessions from Plaintiffs.

188.    The Schumacher Center's and BerkShares Inc.'s violations of Mass. G. L. ch. 93A, §§ 2 and 11 were knowing and willful.

189.   Plaintiffs suffered actual damages in an amount of at least $435,000 which will be proved at trial.

<u>COUNT II</u>
**Breach Of Contract**
**(By Humanity Cash Against the Schumacher Center and BerkShares, Inc.)**

190.   Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

191.   Humanity Cash has met all of its obligations under the Collaboration Agreement.

192.   The Schumacher Center and BerkShares, Inc. materially beached the Collaboration Agreement including by failing and refusing to provide marketing in support of the Digital BerkShares Project, utilizing the grant funds provided for that undertaking.

193.   Humanity Cash suffered actual damages in an amount of at least $435,000 which will be proved at trial.

<u>COUNT III</u>
**Breach Of Good Faith and Fair Dealing**
**(By Humanity Cash Against the Schumacher Center and BerkShares, Inc.)**

194.   Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

195.   The Collaboration Agreement, like all contracts, contains an implied covenant of good faith and fair dealing.

196.   Defendants breached this implied covenant by diverting the grant funding and donations earmarked for the Digital BerkShares Project towards other, unrelated purposes, unilaterally shutting down the Digital BerkShares Project, and  planning to copy and rebuild the Digital BerkShares mobile application developed by Humanity Cash, arrogating for themselves all economic benefits of Plaintiffs' efforts in obtaining grant and donor funding for the Digital BerkShares Project and developing, launching, and maintaining the mobile application.

197.    Plaintiffs suffered actual damages in an amount of at least $435,000 which will be proved at trial.

### COUNT IV
### Breach of Implied Contract
### (By Humanity Cash Against All Defendants)

198.    Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

199.    Plaintiffs performed additional services, at Ms. Witt's and the Schumacher Center's requests, not contemplated by the Collaboration Agreement under the reasonable expectation, based on oral and written representations, that Humanity Cash would receive economic benefit derived from its work for the Schumacher Center.

200.    Defendants received and benefitted from Humanity Cash's performance of those services and knew that they were imparted with the reasonable expectation that the parties would formalize either the services contract or the buy-out offer and Humanity Cash would be compensated for its services.

201.    There is and was, therefore, an implied contract between Humanity Cash, on the one hand, and the Schumacher Center and BerkShares, Inc. on the other.

202.    Defendants breached this implied contract by reneging on their representations that they sought to devise an amicable path forward with Humanity Cash and would compensate Humanity Cash for its services, unilaterally shutting down the Digital BerkShares Project mobile application, and planning to copy and rebuild the Digital BerkShares mobile application developed by Humanity Cash, without compensation to Humanity Cash.

203.    Plaintiffs suffered actual damages, the amount of which will be proved at trial.

## COUNT V
### Quantum Meruit
### (Against All Defendants)

204.    Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

205.    Defendants requested that Plaintiffs provide labor and services to the Project, and Plaintiffs provided those requested labor and services, including payment for and maintenance of the infrastructure for the mobile application, responses to user inquiries, and assistance with responses to FDIC inquiries.

206.    Plaintiffs informed Defendants that $84,000 per year was the fair and reasonable value of the labor and services to maintain the Project, not including the cost of designing, developing, and launching the mobile application. Alternatively, Defendants could buy out the mobile application for $157,000.

207.    Plaintiffs provided those labor and services with the expectation and in reliance that Defendants would compensate it therefor.

208.    Defendants accepted the services provided by Ms. Wang and Humanity Cash with the knowledge of Plaintiffs' expectation of payment.

209.    Defendants permitted – in fact, requested – that Plaintiffs perform its work and deliver services without objection, and although Plaintiffs have made repeated requests for payment for its services, Defendants have failed, neglected, or refused to pay.

210.    Plaintiffs suffered actual damages, the amount of which will be proved at trial.

## COUNT VI
### Misrepresentation
### (Against All Defendants)

211.    Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

212.    Ms. Witt, the Schumacher Center, and BerkShares, Inc. falsely represented to Plaintiffs that the Schumacher Center and BerkShares, Inc. that the Schumacher Center would use the grant and donor funding, allocated for the Digital BerkShares Project, to market and promote the Digital BerkShares mobile application in the Berkshires region to promote public awareness of the Project.

213.    Ms. Witt, the Schumacher Center, and BerkShares, Inc. further falsely represented to Plaintiffs that the Schumacher Center and BerkShares, Inc. would look for funding to compensate Humanity Cash for its services developing, launching, and maintaining the Digital BerkShares mobile application when, in reality, they intended to shut down the mobile application that was developed and launched by Humanity Cash, retain the grant and donor funding that was raised for the Digital BerkShares Project, and copy and rebuild the mobile application without compensating Humanity Cash for its services.

214.    Those representations were false and Defendants were at least negligent in making them.

215.    Humanity Cash relied upon Defendants' representations to its detriment.

216.    Plaintiffs suffered actual damages in an amount of at least $435,000 which will be proved at trial.

### COUNT VII
**Unjust Enrichment**
**(Against the Schumacher Center and Berkshares, Inc.)**

217.    Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

218.    The Schumacher Center has derived, and continues to derive, substantial revenue from the misuse of grants and donations made for the benefit of the Digital BerkShares Project

and has deprived Humanity Cash of the economic advantages which it would have enjoyed if it had not been for the Schumacher Center's wrongful conduct.

219.    Further, as a result of the actions and omissions of the Schumacher Center and Berkshires, Inc., including through their use of mobile application and other Humanity Cash technology and intellectual property, as well as through the post-launch services provided by Humanity Cash, a benefit was wrongfully acquired by the Schumacher Center and Berkshares, Inc.

220.    The Schumacher Center and Berkshares, Inc. have been unjustly enriched at Humanity Cash's expense.

221.    Plaintiffs suffered actual damages in an amount of at least $435,000 which will be proved at trial.

## COUNT VIII
### Defamation Per Se
### (Against All Defendants)

222.    Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

223.    As set out above, Ms. Witt, the Schumacher Center, and BerkShares, Inc. have made false and defamatory statements about Plaintiffs.

224.    Defendants' false and defamatory statements about Plaintiffs were unprivileged and published to third parties.

225.    Defendants' false and defamatory statements concerned Plaintiffs' lack of fitness for trade, business, or profession.

226.    Defendants acted at least negligently.

227.    Ms. Witt was acting within the scope of her employment and in furtherance of the interests of the Schumacher Center and BerkShares, Inc.

228.    Defendants have acted without just cause or excuse, interfered with the carrying of Plaintiffs' business, and harmed their profits, thus inflicting an irreparable injury.

229.    Because Defendants have been guilty of oppression, fraud or malice, express or implied, Plaintiffs, in addition to the compensatory damages, are entitled to punitive and exemplary damages.

**COUNT IX**
**Defamation**
**(Against All Defendants)**

230.    Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

231.    As set out above, Defendants have made false and defamatory statements about Plaintiffs.

232.    Defendants' false and defamatory statements about Plaintiffs were unprivileged and published to third parties.

233.    Defendants acted at least negligently.

234.    Ms. Witt was acting within the scope of her employment and in furtherance of the interests of the Schumacher Center and BerkShares, Inc.

235.    Defendants have acted without just cause or excuse, interfered with the carrying of Plaintiffs' business, and harmed their profits, thus inflicting an irreparable injury.

236.    Because Witt and the Schumacher Center have been guilty of oppression, fraud or malice, express or implied, Plaintiffs, in addition to the compensatory damages, are entitled to punitive and exemplary damages.

**COUNT X**
**Business Disparagement**
**(Against All Defendants)**

237.    Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

238.    As set out above, Defendants have made false and disparaging statements about Plaintiffs' business.

239.    Defendants' false and disparaging statements about Plaintiffs' business were unprivileged and published to third parties.

240.    Defendants acted with malice, in that they had either the intent to cause harm to Plaintiffs' pecuniary interests, or they published their disparaging remarks knowing that those remarks were false or with reckless disregard for the truth of the remarks.

241.    Ms. Witt was acting within the scope of her employment and in furtherance of the interests of the Schumacher Center and BerkShares, Inc.

242.    Defendants' false and disparaging statement about Plaintiffs' business were the proximate cause of Plaintiffs' special damages in an amount of at least $72,000 and which will be proven at trial.

243.    Defendants have acted without just cause or excuse, interfered with the carrying of Plaintiffs' business, and harmed their profits, thus inflicting an irreparable injury.

244.    Because Defendants have been guilty of oppression, fraud or malice, express or implied, Plaintiffs, in addition to the compensatory damages, are entitled to punitive and exemplary damages.

**COUNT XI**
**Intentional Interference with Prospective Business Advantage**
**(Against All Defendants)**

245.    Plaintiffs incorporate the allegations set forth in the preceding paragraphs.

246.    As set out above, Ms. Wang and Humanity Cash had prospective relationships with others in the nonprofit sector in the Berkshires and adjacent Hudson Valley region, namely, the NoVo Foundation, among others.

247.    Defendants were aware of those relationships.

248.    Defendants intended to harm Plaintiffs by preventing those prospective relationships from being consummated.

249.    Defendants' conduct was without justification or privilege.

250.    Witt was acting within the scope of her employment and in furtherance of the interests of the Schumacher Center and BerkShares, Inc.

251.    As a result of Defendants' conduct, Plaintiffs have suffered actual and presumed damages in an amount of at least $72,000 and which will be proven at trial.

252.    Defendants have acted without just cause or excuse, interfered with the carrying of Plaintiffs' business, and harmed their profits, thus inflicting an irreparable injury.

253.    Because Defendants have been guilty of oppression, fraud or malice, express or implied, Plaintiffs, in addition to the compensatory damages, are entitled to punitive and exemplary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs requests the following relief:

(a)    An award of damages in an amount to be proved at trial, but in no event less than $507,000;

(b)    An award of treble damages and attorneys' fees under Mass. Gen. Laws ch. 93A, § 11;

(c)    An award of appropriate permanent injunctive relief, including but not limited to an order requiring the Schumacher Center and all its employees, agents, representatives, and all persons acting in concern, cooperation, or concern with it, including but not limited to Ms. Witt, to cease making false and defamatory statements about Humanity Cash or Ms. Wang to any of Humanity Cash's existing or prospective business contracts;

(d)     All costs and expenses to which Plaintiffs are entitled, including reasonable

attorneys' fees to the extent permitted by law;

(e)     Pre- and post-judgment interest; and

(f)     Such other relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs demand a trial by jury as to any issues so triable.

Respectfully submitted,

THE PLAINTIFFS,

NEIGHBORLY CAPITAL COMPANY d/b/a
HUMANITY CASH and NING-FENG
WANG,

By their attorney,

/s/ Kent Sinclair
Kent D.B. Sinclair (BBO No. 639597)
SINCLAIR LAW LLC
Box 5503
Beverly, MA 01915
(781) 454-7208
ksinclair@kentsinclair.com

Dated: February 14, 2023

Of Counsel:
Ievgeniia P. Vatrenko, Esq.
2 Northside Piers
Brooklyn, New York 11249
Tel.: (718) 451-6384
jenny@vatrenkoesq.com
*(Not admitted in D. Mass.)*