UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NEIGHBORLY CAPITAL COMPANY d/b/a HUMANITY CASH, and NING-FENG WANG,<br><br>Plaintiffs,<br><br>v.<br><br>SCHUMACHER CENTER FOR A NEW ECONOMICS, SUSAN WITT, and BERKSHARES, INC.,<br><br>Defendants. | ) | Case No. 3:23-cv-30017-CLM |

MEMORANDUM AND ORDER ON PLAINTIFFS' MOTION TO PARTIALLY LIFT STAY AND FOR LEAVE TO FILE AMENDED COMPLAINT AND DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM OR, SOLELY IN THE ALTERNATIVE, TO TRANSFER ARBITRABLE CLAIMS AND STAY NON-ARBITABLE CLAIMS
(Dkt. Nos. 51, 56)

Neighborly Capital Company d/b/a Humanity Cash ("Humanity Cash") and Ning-Feng Wang ("Wang") (collectively, "Plaintiffs") filed suit against the defendants Schumacher Center for a New Economics ("Schumacher Center"), Susan Witt ("Witt"), and BerkShares, Inc. (collectively, "Defendants"), arising from a project to launch a digital version of a community currency, dubbed "BerkShares", that Schumacher Center had successfully debuted in 2006 to foster the local economy in Berkshire County, Massachusetts. The entity parties—Humanity Cash, Schumacher Center, and BerkShares, Inc.—are all parties to an agreement that requires disputes between them to be arbitrated in New York. Notwithstanding the mandatory arbitration clause, Plaintiffs filed suit first in this court and only

initiated an arbitration proceeding after Defendants moved for dismissal. This court entered a stay pending the arbitrator's decision regarding the arbitrability of the non-entity claims—that is, those claims asserted by Wang and against Witt, neither of whom are parties to the collaboration agreement.

The arbitrator has now decided that Wang and Witt cannot be compelled or permitted to assert or defend their claims in the arbitration proceeding. This memorandum and order resolves the parties' conflicting views of what should happen to the arbitrable and non-arbitrable claims in this court while the arbitration proceeds. Plaintiffs seek a continuance of the stay as to the arbitrable claims as they proceed through the arbitration process, a lifting of the stay as to the non-arbitrable claims, and leave to file an amended complaint adding factual allegations reportedly learned during discovery. Defendants seek dismissal of the arbitrable claims or, in the alternative, transfer of those claims to the Southern District of New York. As to the non-arbitrable claims, Defendants oppose Plaintiffs' effort to amend the complaint and seek dismissal for failure to state a claim. In the alternative, they ask for a stay pending the resolution of the arbitration proceedings.

For the reasons set forth below, the court determines that the arbitrable claims should be transferred to the Southern District of New York, and the non-arbitrable claims should be stayed pending the outcome of the arbitration. Accordingly, the court DENIES without prejudice Plaintiffs' motion to partially lift the stay and for leave to file amended complaint (Dkt. No. 51), and GRANTS in part

and DENIES in part without prejudice Defendants' motion to dismiss for failure to state a claim, or, solely in the alternative, to transfer arbitrable claims and stay non-arbitrable claims (Dkt. No. 56). The claims asserted by Humanity Cash against Schumacher Center and BerkShares, Inc., are transferred to the Southern District of New York. The claims asserted by Humanity Cash and Wang against Witt and by Wang against Schumacher Center and BerkShares, Inc., are stayed pending completion of the arbitration.

## I. Operative Allegations[1]

In 2006, Schumacher Center, a Massachusetts 501(c)(3) not-for-profit corporation, debuted a community currency fully backed by U.S. dollars and intended to foster the local economy in Berkshire County, Massachusetts, which it called "BerkShares" (Dkt. No. 1 at ¶¶ 20, 26). Since inception, more than $10 million worth of BerkShares have been issued (Dkt. No. 1 at ¶¶ 26-27). Historically, BerkShares could be obtained in the form of paper notes at participating banks, including Salisbury Bank, Lee Bank, and Pittsfield Cooperative Bank, in exchange for an equivalent amount of U.S. dollars (Dkt. No. 1 at ¶ 28). The funds would then be deposited into a customer holding account held by BerkShares, Inc., a Massachusetts not-for-profit corporation that was separate and distinct from Schumacher Center on paper but was *de facto* controlled by it (Dkt. No. 1 at ¶¶ 22,

[1] The allegations summarized herein are based on the allegations in the complaint, which the court accepts as true solely for the purposes of this order.

28, 30). Holders of BerkShares could spend them with participating merchants, who could redeem them for U.S. dollars (Dkt. No. 1 at ¶ 28).

In 2020, Wang, who had professional experience in the digital currency industry, reached out to Schumacher Center about the possibility of creating a digital version of BerkShares that would utilize a public blockchain ledger, thereby supplanting the credit card interchange networks and saving merchants money on credit card interchange fees running as high as 3-4% per transaction (Dkt. No. 1 at ¶¶ 31, 33, 41-42). In the fall of that year, Wang met with Witt, the Executive Director of Schumacher Center and Treasurer of the Board of Directors of both Schumacher Center and BerkShares, Inc., to discuss a digital BerkShares project, which the parties then began to develop in the winter and spring of 2021 (Dkt. No. 1 at ¶¶ 21, 34-35, 123). During this time, Wang began to design a regulatory structure in conjunction with a law firm acting as *pro bono* outside counsel for Shumacher Center, and to pursue potential funding sources for the project (Dkt. No. 1 at ¶¶ 35, 43-45, 48).

In May 2021, Wang founded Humanity Cash as a Delaware public benefit corporation committed to developing digital community currencies, starting with the digital BerkShares project (Dkt. No. 1 at ¶¶ 2, 36). Thereafter, on June 2, 2021, Humanity Cash, Schumacher Center, and BerkShares, Inc., entered into a collaboration agreement to formalize and implement the digital BerkShares project (hereinafter, "Collaboration Agreement"), under which Humanity Cash was to develop the necessary software, including a mobile application; assist with user

adoption and education, as well as marketing and public relations; and formulate a regulatory compliance strategy for digital BerkShares (Dkt. No. 1 at ¶¶ 37-38; Dkt. No. 19-1, at 4). Schumacher Center was to guide marketing and public relations, as well as local fundraising to support marketing, including launching a giveaway program, while BerkShares, Inc., was to guide user adoption and education and provide feedback on user experience and design (Dkt. No. 1 at ¶ 38; Dkt. No. 19-1, at 4). The Collaboration Agreement did not provide for any form of monetary compensation, instead noting Humanity Cash's wish "to develop the technology to take BerkShares digital and then . . . sell or license or otherwise distribute that technology to other community groups" (Dkt. No. 19-1, at 2). Regarding capital contributions, the Collaboration Agreement provided that Humanity Cash would "provide capital and development services, as well as other ancillary services to launch the digital BerkShares pilot," while Shumacher Center and BerkShares, Inc., would "provide in-kind support" (Dkt. No. 19-1, at 4). The Collaboration Agreement contains a clause providing that the parties "submit any and all disputes arising out of or in connection to this Collaboration Agreement . . . to binding arbitration . . . [to] be conducted in the state of New York in accordance to the rules of JAMS . . . [under] applicable and governing Federal law as well as the laws of the state of New York" (Dkt. No. 19-1, at 7). The parties further agreed that the "choice of law, venue, and jurisdiction provision, together with. . . [the] election of arbitration, [wa]s not permissive, but rather mandatory in nature" (*id.*).

According to Wang, Humanity Cash held up its end of the bargain, and, throughout the summer, fall, and winter of 2021 leading into 2022, contributed significant resources to designing digital BerkShares and the associated mobile application, as well as drafting bank agreements in conjunction with Schumacher Center's *pro bono* financial services outside counsel and students in a Harvard Law School clinical program, all with the participation and involvement of Schumacher Center staff, including Witt (Dkt. No. 1 at ¶¶ 53-61). In addition, Wang devoted time and energy to identifying and pursuing funding opportunities, helping Schumacher Center secure at least $460,000 in grant funding to be used for marketing, user adoption, and program support (Dkt. No. 1 at ¶¶ 64-68). All these efforts paid off; on March 21, 2022, digital BerkShares became available in the Berkshires region and the mobile application launched on the Apple App and Google Play stores (Dkt. No. 1 at ¶¶ 39, 80).

Plaintiffs maintain that while Humanity Cash worked diligently to meet its contractual obligations, Schumacher Center did not. Despite presenting a marketing plan for digital BerkShares in the fall of 2021, Schumacher Center never implemented it even in the face of Wang's repeated inquiries (Dkt. No. 1 at ¶¶ 62-63, 88-89). Moreover, following the launch, Witt began to raise concerns about regulatory requirements associated with money services businesses and make demands that were not contemplated by the Collaboration Agreement. In particular, Witt requested additional review of potential exposure to money services businesses regulatory requirements with a new law firm serving as outside counsel,

and, along with another member of Schumacher Center's Board, Paul Fletcher-Hill ("Fletcher-Hill"), requested that Humanity Cash assume responsibility for the project's money services registration requirements to the extent such registration became necessary in the future (Dkt. No. 1 at ¶¶ 82-85). According to Wang and Humanity Cash, these concerns were unfounded because Digital BerkShares were designed using a "prepaid closed loop model," which allowed Schumacher Center and BerkShares, Inc., to be exempt from the Bank Secrecy Act and attendant regulatory requirements, such as registration with FinCEN as a money services business (Dkt. No. 1 at ¶¶ 70-77).

Nevertheless, during a meeting on May 18, 2022, Witt indicated that Schumacher Center and BerkShares, Inc., would not provide marketing support until their money services business concerns were resolved and unless Humanity Cash developed additional features not contemplated by the Collaboration Agreement (Dkt. No. 1 at ¶ 90). Wang, in response, suggested that the parties' agreement would have to be amended to provide compensation for Humanity Cash's provision of future development and infrastructure services; later, she provided a draft of a new services contract, which outlined the conditions of Humanity Cash's registering as a money services business and left open for discussion Humanity Cash's estimated cost of services going forward (Dkt. No. 1 at ¶¶ 93, 102-103). During further discussions with Witt and Fletcher-Hill, however, Wang and a colleague, Andy Kalambi ("Kalambi"), advised them that it would cost Humanity Cash $84,000 annually to maintain the project's infrastructure, not inclusive of new

development costs; alternatively, they suggested that BerkShares, Inc., could buy the digital BerkShares mobile application for $157,000, which represented a significant discount on the cost of development (Dkt. No. 1 at ¶¶ 109-10). From the time the issue of compensating Humanity Cash arose on May 18, 2022, throughout the summer and into the fall of that year, Schumacher Center and BerkShares, Inc., accepted Humanity Cash's services knowing that Humanity Cash expected to formalize a paid services contract, which never happened (Dkt. No. 1 at ¶¶ 105, 112-13).

In or around October 2022, Wang learned that Schumacher Center had deposited only $20,000 of $60,000 in donor funds that were to be used to fund a BerkShares token giveaway into customer holding accounts (Dkt. No. 1 at ¶¶ 51-52, 141-42). This meant that only $20,000 of the tokens were backed by U.S. dollars (Dkt. No. 1 at ¶ 142). Wang and Kalambi met with members of the boards of Schumacher Center and BerkShares, Inc., including Witt, on October 17, 2022 (Dkt. No. 1 at ¶¶ 145-46). During the meeting, Wang was advised that Schumacher Center could not afford Humanity Cash's $157,000 buyout offer and instead could pay $25,000 at most (Dkt. No. 1 at ¶ 147). Witt and another member of the board threatened to unilaterally shut down the digital BerkShares mobile application if Wang did not accept the offer, which could lead to a disorderly shutdown process (Dkt. No. 1 at ¶¶ 147-48, 154). Wang advised Schumacher Center that Humanity Cash could no longer be associated with the digital BerkShares project given the

compliance breach but that she needed time to formulate a response to Schumacher Center's offer (Dkt. No. 1 at ¶¶ 156, 158).

Sometime during the fall of 2022, Witt had a phone conversation with Martin Kirk ("Kirk") of the NoVo Foundation, a prospective grant donor on an unrelated community currency project in Kingston, New York, during which Witt falsely accused Wang and Humanity Cash of coercive and threatening conduct toward Schumacher Center (Dkt. No. 1 at ¶¶ 12, 159-61, 166). According to Plaintiffs, these false accusations resulted in Kirk withdrawing a $72,000 grant to Humanity Cash from NoVo Foundation (Dkt. No. 1 at ¶¶ 165, 168).

On November 4, 2022, Schumacher and BerkShares, Inc., sent a letter terminating the Collaboration Agreement with Humanity Cash and demanding that Humanity Cash turn over ownership and control of its intellectual property and project-related technology, including the entire BerkShares digital platform (Dkt. No. 1 at ¶ 170). When Humanity Cash refused, Shumacher Center, abruptly and without first informing Wang, shut down the digital BerkShares mobile application on November 17, 2022, and retained substantially all the donor and grant funding that was earmarked for the digital BerkShares project (Dkt. No. 1 at ¶ 171-73, 178). Humanity Cash, however, kept the mobile application running on its servers through the end of the month at its own expense to protect digital BerkShares users (Dkt. No. 1 at ¶ 174).

## II. Procedural History

Humanity Cash and Wang filed suit on February 14, 2023, asserting eleven causes of action: Humanity Cash against Shumacher Center and BerkShares, Inc. for unfair trade practices in violation of Mass. Gen. Laws ch. 93A, §§ 2 and 11 (Count I), breach of contract (Count II), breach of the implied covenant of good faith and fair dealing (Count III), and Unjust Enrichment (Count VII); Humanity Cash against all Defendants for breach of implied contract (Count IV); and Humanity Cash and Wang against all Defendants for quantum meruit (Count V), misrepresentation (Count VI), defamation per se (Count VIII), defamation (Count IX), business disparagement (Count X), and intentional interference with prospective business advantage (Count XI) (Dkt. No. 1). Defendants moved to dismiss the complaint on the grounds that Plaintiffs' claims were subject to and barred by the arbitration clause contained in the Collaboration Agreement and otherwise failed to state a claim upon which relief could be granted pursuant to Fed. R. Civ. P. 12(b)(6) (Dkt. No. 18). Plaintiffs did not dispute that the claims brought by Humanity Cash against Schumacher Center and BerkShares, Inc., were subject to arbitration but maintained that the arbitrability of the claims brought by Wang and against Witt, neither of whom were signatories to the Collaboration Agreement in their respective individual capacity, had to be determined by the arbitrator in the JAMS proceeding that Plaintiffs had since initiated (Dkt. No. 25). On March 19, 2024, the court issued an order staying the matter "pending the arbitrator's decision . . . on the arbitrability of the claims brought by Wang and against Witt," and denying Defendants' motion to dismiss for failure to state a claim without prejudice

(Dkt. No. 43, at 12). The court ordered the parties to provide notice "of the decision of the arbitrator as to the question of arbitrability within 14 days thereof" (*id.*).

Nearly seventeen months to the day after the court issued its stay order, on August 18, 2025, Plaintiffs filed a "Notice of Decision on Arbitrability," representing that they received the arbitrator's order "h[olding] that Ms. Wang and Ms. Witt may not assert claims or have claims asserted against them individually in the JAMS proceeding" (Dkt. No. 44, at 1). Plaintiffs indicated that they had received the arbitrator's decision ten days earlier, on August 8, 2025 (*id.*). They asked that the court lift the stay as to claims involving Wang and Witt individually and to schedule a status conference to set a new schedule as to those claims and to explore the possibility of referral to the court's mediation services (*id.*).

Defendants made their own filing that same day, consisting of a letter appending the arbitrator's decision, which is dated January 24, 2025 (Dkt. Nos. 45, 45-1). By way of explanation for the nearly seven month temporal gap between the decision and the parties' notification to the court of that decision, Defendants represented that the decision "was not released to the parties until recently given Plaintiffs' longstanding failure to pay the arbitrator's fees" (Dkt. No. 45, at 1 n.1). In their letter, Defendants purported to renew their motion to dismiss as to the arbitrable and non-arbitrable claims alike on the ground that the former are precluded by a binding arbitration clause and the latter fail to state a claim (Dkt. No. 45, at 1-2).

Plaintiffs filed an opposition to Defendants' letter arguing that the arbitrable claims must remain stayed, requesting supplemental briefing regarding the non-arbitrable claims, and indicating that they intended to amend their complaint as to Wang's claims against Witt "to supplement it with . . . additional false statements uncovered in discovery" (Dkt. No. 46, at 1-2). Plaintiffs represented that they would confer with Defendants as to whether they would agree to the proposed amendments before seeking leave of court to add them (*id.* at 2).

Following reassignment of the matter to this session, the parties filed a joint motion seeking a briefing schedule for Plaintiffs to file a motion to lift the stay and requesting leave to amend and for Defendants to file a renewed motion to dismiss, which this court granted (Dkt. Nos. 50, 53-54). Briefing on these motions is now complete (Dkt. Nos. 51-52, 56-58, 60-61, 66, 69), and the court heard argument from the parties on their respective positions (Dkt. No. 72).

## III. Discussion

### A. The Existing Stay

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 617 B.R. 173, 179 (D.P.R. 2020) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). "It is axiomatic that 'federal courts possess the inherent power to stay proceedings for prudential reasons.'" *Green v. Cosby*, 177 F. Supp. 3d 673, 678 (D. Mass. 2016) (quoting *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385

F.3d 72, 77 (1st Cir. 2004)). "[A]fter imposition of a stay for prudential reasons, 'the court retains the ability to modify or dissolve the stay . . ..'" *In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*, 617 B.R. at 179 (quoting *Green*, 177 F. Supp. 3d at 681).

Here, the court entered a stay of the proceedings pending the arbitrator's decision on the arbitrability of the claims brought by Wang and against Witt (Dkt. No. 43). The arbitrator issued his decision on January 24, 2025, obviating the reason for the stay. Accordingly, the court lifts that stay and considers separately whether a new stay should be entered as to the arbitrable and non-arbitrable claims.

B. The Arbitrable Claims

Plaintiffs invoke 9 U.S.C. § 3 to ask this court to stay the arbitrable claims, i.e. those brought by Humanity Cash against Schumacher Center and BerkShares, Inc. That section provides that "[i]f any suit . . . be brought in any of the courts of the United States upon any issue referable to arbitration . . . , the court in which such suit is pending . . . shall on application of one of the parties stay the trial of the action until such arbitration has been had." 9 U.S.C. § 3. The Supreme Court has interpreted the statute in line with its plain meaning, holding that "[w]hen a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the [Federal Arbitration Act] compels the court to stay the proceeding." *Smith v. Spizziri*, 601 U.S. 472, 478 (2024). *See also Jules v. Andre Balazs Props.*, 608 U.S. 200, 212 (2026) ("The [Federal Arbitration Act] requires a stay, rather than dismissal, so that a court that has granted a § 3

stay can superintend the arbitration to the end, including through confirmation or vacatur.”).

Defendants do not dispute the general rule that where claims in a lawsuit are subject to arbitration, a court is required to stay the litigation upon request. However, Defendants seize on a footnote in the *Smith* decision providing that § 3 of the Act does not “bar[ a court] from dismissing the suit if there is a separate reason to dismiss, unrelated to the fact that an issue in the case is subject to arbitration . . . [including,] for example, [cases where] the court lacks jurisdiction.” *Id.* at 476 n.2. According to Defendants, because the arbitration clause of the Collaboration Agreement mandates a New York forum, this court lacks “proper jurisdiction” to utilize the Federal Arbitration Act’s “mechanisms . . . to assist parties in arbitration,” such as to enforce subpoenas and facilitate recovery of an arbitral award. *Id.* at 478. Defendants acknowledge that the United States District Court for the Southern District of New York would have proper jurisdiction and request transfer to that court as an alternative to dismissal.

The court concludes that the appropriate course here is to transfer the arbitrable claims to the Southern District of New York. Section 3 of the Federal Arbitration Act precludes dismissal of Humanity Cash’s arbitrable claims against Schumacher Center and BerkShares, Inc., but transfer on venue grounds is appropriate. The Collaboration Agreement contains a mandatory arbitration clause providing that the parties “submit any and all disputes arising out of or in connection to this Collaboration Agreement . . . to binding arbitration . . . [to] be

conducted in the state of New York in accordance to the rules of JAMS . . . [under] applicable and governing Federal law as well as the laws of the state of New York" (Dkt. No. 19-1, at 7). "This 'mandatory' arbitration-forum selection clause means that only [New York] is the appropriate venue," not Massachusetts. *Kenerson v. Elemetal Direct USA, Inc.*, C.A. No. 1:24-cv-00156-MSM-LDA, 2024 WL 4591661, at *4 (D.R.I. Oct. 28, 2024) (citing *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 17 (1st Cir. 2009)).

Plaintiffs argue that the case is not transferable to the Southern District of New York under 28 U.S.C. § 1406(a), because that provision only authorizes transfer when venue is "wrong" or "improperly laid" under 28 U.S.C. § 1391(b), as opposed to in conflict with a forum selection clause (Dkt. No. 61, at 11-12). While Plaintiff is correct that "a forum selection clause does not render venue improper under § 1391(b), and[, therefore,] cannot be enforced under § 1406(a), the clause 'may be enforced through . . . § 1404(a).'" *Kenerson*, 2024 WL 4591661, at *5 (quoting *Atl. Marine Const. Co. v. U.S. Dist. Ct.*, 571 U.S. 49, 59 (2013)). Pursuant to § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action . . . to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). This includes "any other district to which the parties have agreed by contract," as the parties here have in the Collaboration Agreement. *Atl. Marine Const. Co.*, 571 U.S. at 59. Because a "[c]ourt should enforce an arbitration agreement's forum selection clause . . . so long as it is valid and there are no truly exceptional circumstances to justify departure

from the clause," *Kenerson*, 2024 WL 4591661, at *6 (citing *Atl. Marine Const. Co.*, 571 U.S. at 63), transfer of the arbitrable claims to the Southern District of New York is appropriate.

C. The Non-Arbitrable Claims

While Defendants' primary request is that the non-arbitrable claims be dismissed, in the interests of judicial economy, the court first addresses their alternative request that the claims be stayed. The non-arbitrable claims include Humanity Cash's claim against Witt for breach of implied contract, which Humanity Cash also asserts against Schumacher Center and BerkShares, Inc. (Count IV), as well as Humanity Cash's and Wang's claims against Witt for quantum meruit (Count V), misrepresentation (Count VI), defamation per se (Count VIII), defamation (Count IX), business disparagement (Count X), and intentional interference with prospective business advantage (Count XI), which they also assert against Shumacher Center and BerkShares, Inc. (Dkt. No. 1).

The court finds that a stay of the non-arbitrable claims is appropriate. "The [Federal Arbitration Act] institutes 'a liberal federal policy favoring arbitration agreements' thus 'establish[ing] . . . as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Peterson v. Binnacle Capital Servs. LLC*, 364 F. Supp. 3d 108, 113 (D. Mass. 2019) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)). "[C]ourts [in this district] have found that where claims against defendants not subject to an arbitration agreement are interconnected with claims against

defendants that are, even defendants who have no right to arbitrate may be entitled to the benefit of a stay." *Odunukwe v. Trans Union, LLC*, Civil Action No. 21-cv-10828-ADB, 2021 WL 4554089, at *4 (D. Mass. Oct. 5, 2021) (citing *Spencer Furniture, Inc. v. Media Arts Grp., Inc.*, 349 F. Supp. 2d 49, 53-54 (D. Mass. 2003)). This is precisely the situation presented here. All claims Plaintiffs assert against Witt, they also assert against Schumacher Center and BerkShares, Inc., and each claim against Witt is stated in the same count and based on the identical factual allegations as against Schumacher Center and BerkShares, Inc.[2] "[Plaintiffs'] claims against [Schumacher Center and BerkShares, Inc.] and [Witt] are thus inseparable and . . . , if the case against [Witt] were to proceed while the arbitration between [Humanity Cash] and [Schumacher Center and BerkShares Inc.] is pending, the latter would be both redundant and meaningless, the federal policy in favor of arbitration would be thwarted and [Schumacher Center's and BerkShares Inc.'s] right to arbitrate would be adversely affected." *Spencer Furniture*, 349 F. Supp. 2d at 53-54.

Nor is the court persuaded that a stay of the non-arbitrable claims would prejudice Plaintiffs. Wang asserts that if her claims are stayed, she is denied a forum, but that is incorrect. Wang's claims will remain pending in this forum, and she can pursue them, as appropriate, once the arbitration is complete. Nor does the

[2] Plaintiffs concede that all the claims arise from the same factual predicate (Dkt. No. 52, at 16 ("The individual claims arise from the same nucleus of operative facts as the arbitrable claims . . . ."); Dkt. No. 60, at 14 ("[T]he individual claims arise from the same factual nucleus.")).

stay delay her ability to engage in discovery, since discovery is taking place in the context of the arbitration proceeding.[3] On the other hand, if Defendants are required to defend the claims in this forum at the same time they are defending them in the arbitration proceeding, the financial costs incurred by all parties will increase. Parallel proceedings would also represent a waste of scarce judicial resources and pose a risk of inconsistent or duplicative judgments.

Accordingly, this court concludes that "[w]hile [Witt] is not a party to the [Collaboration] Agreement[ ] and therefore not bound to arbitrate, [s]he is entitled to the benefit of the stay provisions of the [Federal Arbitration Act]." *Spencer*, 349 F. Supp. 2d at 53. Moreover, "[e]ven if the stay provision of the [Federal Arbitration Act] did not apply to [Witt], this Court has inherent power, in exercising control over its docket, to stay in its discretion the proceeding against [Witt] pending the outcome of the arbitration." *Id.* at 54, n.3.

## IV. Conclusion

For the above-stated reasons, the court DENIES without prejudice Plaintiffs' motion to partially lift the stay and for leave to file amended complaint (Dkt. No. 51) and GRANTS in part and DENIES in part without prejudice Defendants' motion to dismiss for failure to state a claim, or, solely in the alternative, to transfer arbitrable claims and stay non-arbitrable claims (Dkt. No. 56). The claims asserted

[3] According to a report filed by Plaintiffs, fact discovery in the arbitration is scheduled to close on December 28, 2026, with depositions of Wang and Witt scheduled for early December, and the evidentiary hearing to take place June 14-17, 2027 (Dkt. No. 73, at 1-2).

by Humanity Cash against Schumacher Center and BerkShares, Inc., are transferred to the Southern District of New York. The claims asserted by Humanity Cash and Wang against Witt and by Wang against Schumacher Center and BerkShares, Inc., are stayed pending completion of the arbitration between Humanity Cash and Schumacher Center and BerkShares, Inc. Thereafter, if appropriate, Plaintiffs may renew their motion for leave to file an amended complaint, and Defendants may renew their motion to dismiss.

It is so ordered.

/s/ Christopher L. Morgan
CHRISTOPHER L. MORGAN
United States Magistrate Judge

DATED: November 18, 2026